

**SO ORDERED.**

**SIGNED this 28th day of March, 2013.**



Robert E. Nugent
United States Chief Bankruptcy Judge

**PUBLISHED**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **KIMBERLY DAWN BRATT,** | ) | **Case No. 10-12055** |
| | ) | **Chapter 7** |
| Debtor | ) | |
| | ) | |
| **TODD DUGGINS and** | ) | |
| **WILLIAM F. CUMMINGS, Receiver for** | ) | |
| **Shanannigans, L.L.C.,** | ) | |
| | ) | |
| Plaintiffs | ) | |
| vs. | ) | **Adversary No. 10-5243** |
| | ) | |
| **KIMBERLY DAWN BRATT,** | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION</u>**

-1-

### *Introduction*

Sometime in his life, nearly every guy wishes he could own a bar. When Todd Duggins met Dean Bratt, he realized that wish. Dean invited Duggins and Clifford Lewis to invest in a south Wichita club called Shanannigans. The three formed a limited liability company to acquire the club from another limited liability company owned by Dean and Kim Bratt, Bratt Investments, L.L.C. When Dean and Duggins fell out, Duggins placed the bar in receivership. Bratt Investments filed a chapter 11 case here and, when that effort failed, Dean and Kim filed a chapter 7 case. When Dean failed to follow court orders, he was dismissed from that case, leaving Kim, who was never a member of the Shanannigans LLC, on the hook both as a debtor and as a defendant in Duggins' and the state court receiver's action for exceptions to discharge based upon actual fraud and fiduciary defalcation.

When a debtor has incurred a debt by actual fraud or false representation, that debt may be excepted from her discharge under § 523(a)(2)(A), if the debtor actually made false representations on which her creditor justifiably relied. If that debtor commits an act of defalcation while standing in a fiduciary relationship to the creditor, that debt is excepted, too. This adversary proceeding involves determining whether defendant Kimberly Bratt, the last defendant standing in this case, defrauded Todd Duggins by inducing him to invest in the Shanannigans bar with her husband and Clifford Lewis. It also requires me to determine if Kim, who was the secretary, but not a member of Shanningan's, L.L.C., the entity that owned the bar, had a sufficient fiduciary capacity to the company to support its defalcation claim under § 523(a)(4).

### *Claims and Summary Ruling*

The plaintiffs in this nondischargeability action assert separate claims against Kim Bratt.

Plaintiff Duggins, a one-third member and officer of Shanannigans, L.L.C., contends that Kim fraudulently induced him to invest $25,000 and become a member of the LLC, in violation of 11 U.S.C. § 523(a)(2)(A). Plaintiff Cummings (the "Receiver"), asserts a claim on behalf of the LLC under 11 U.S.C. § 523(a)(4), claiming that Kim committed defalcation while acting in a fiduciary capacity by converting corporate assets and failing to account for funds and property that belonged to the LLC.

Because Duggins failed to prove by a preponderance of the evidence that Kim made false representations or otherwise engaged in actual fraud with the intent to deceive him, Kim is entitled to judgment on his § 523(a)(2) claim. The Receiver failed to show that Kim had the requisite fiduciary capacity to support a claim under § 523(a)(4) where no funds or property of the LLC had been entrusted to her and she had neither a technical nor an express trust relationship with the LLC. Kim is entitled to judgment on that claim, too.[1]

### *Jurisdiction*

The plaintiffs' § 523(a) claims to except debtor's debt from her discharge are core proceedings under 28 U.S.C. § 157(b)(2)(I) over which this Court may exercise subject matter jurisdiction.[2]

### *Facts*[3]

This adversary proceeding began in November of 2010 with plaintiffs' nondischargeability

---

[1] At the two-day trial of this matter in February, 2013, the plaintiffs appeared by their attorney Joseph H. Cassell. Defendant Kimberly Bratt appeared *pro se.*

[2] *See* 28 U.S.C. § 1334 and § 157(b)(1).

[3] The Court has incorporated the parties stipulations of fact contained in the final pretrial order. Adv. Dkt. 105.

claims being asserted against Kim Bratt and her husband Dean Bratt, who at that time was also a debtor in the Bratts' joint bankruptcy case.[4] After Dean twice failed to appear for his first meeting of creditors, the chapter 7 trustee moved to dismiss his bankruptcy case and that motion was granted on July 18, 2012. As Dean was no longer seeking a chapter 7 discharge, this proceeding was moot as to him, so I dismissed him as a defendant *sua sponte*.[5] Dean's dismissal left Kim as the sole defendant here, though his role in the events giving rise to the complaint remains important.

Kim and Dean are married. Each owns a one-half interest in Bratt Investments, L.L.C. (Bratt Inv).[6] Bratt Inv holds and manages a number of real estate properties and was itself a chapter 11 debtor.[7] Among those properties was a bar called Magoo's. Sometime in 2007, Bratt Inv acquired a commercial strip center where it intended to open and operate Shanannigan's Bar and Grill

---

[4] The Bratts initially filed a chapter 11 case in June of 2010. It was converted to a chapter 7 case on February 6, 2012.

[5] *See* Bankr. Dkt. 230; Adv. Dkt. 99. As Dean had been dismissed from the chapter 7 case, he could not expect to receive a discharge in any event.

[6] To further complicate the prosecution and trial of this adversary proceeding, Kim and Dean are in the process of divorcing but, as of the date of trial, that action is incomplete and remains pending. Kim was represented by counsel in this adversary proceeding until January of 2013 when her attorney withdrew. The final pretrial order was entered in October of 2012, while Kim was represented. *See* Adv. Dkt. 105.

[7] Bratt Investments filed a chapter 11 small business bankruptcy in this Court on August 20, 2010 (Case No. 10-12851). At a confirmation hearing conducted on April 21, 2011, the Court confirmed Bratt Investments' plan, but no confirmation order was ever prepared or entered. By September, the U.S. Trustee had filed a motion to convert or dismiss the case because the debtor failed to filed monthly reports or to pay its quarterly fees. At the hearing on that motion on November 10, I directed that a confirmation order be entered in 14 days or the case would be dismissed. At a further hearing on December 8, in the absence of a confirmation order or the filing of the missing reports, I ordered the case dismissed and an order of dismissal was entered on December 16, 2011. The case was closed in June of 2012.

(hereafter referred to as Shanannigan's East or SBG).[8] This property was encumbered by a first mortgage loan in favor of Meritrust Credit Union (formerly Boeing Wichita Credit Union).

In late 2007 or early 2008, Dean invited Duggins and Clifford Lewis to invest in the SBG venture and become one-third "partners" with him. Dean asked Duggins to invest $25,000 in SBG. In early 2008, the three partners formed Shanannigan's L.L.C. to own and operate the bar. At the first annual meeting of members of the LLC on January 11, 2008, Dean announced that he would sell a third of the company each to Duggins and Lewis, effective January 1, 2008, making the three men equal one-third members of the LLC. At that meeting, Dean was elected president of the LLC, Lewis was elected vice-president, Duggins was elected treasurer, and Kim, who was not a member, became secretary. Kim had no equity or other direct legal interest in the bar.

Bratt Inv had acquired the SBG property sometime in the fall of 2007. Lewis Lewis had assisted in some remodeling work that was done prior to SBG's opening on January 18, 2008. Bratt Inv sold SBG to Shanannigan's LLC, subject to the Meritrust mortgage, under a contract for deed dated April 21, 2008. The terms and conditions of the contract stipulated that, among other things, Dean Bratt would have "operational control" of the bar. Shanannigan's opened for business on January 18, 2008, well before the contract was signed and closed. Duggins paid his $25,000 investment to Bratt Inv in June, 2008.[9]

Duggins worked daily at SBG from the time it opened until February of 2010, departing a month before the bar closed. During the first year of SBG's operations, Kim worked there, too,

---

[8] In addition to SBG, Guardian Interlock was a tenant at one end of this strip center and had a monthly rent obligation of $500, payable to SBG.

[9] *See* KAN. STAT. ANN. § 17-7686(c) recognizing that an individual may be admitted as a member of a LLC and receive a LLC interest without making a contribution.

handling daily bookkeeping and management functions. In the spring of 2009, either Bratt Inv or Dean and Kim as individuals opened a second Shanannigan's on the west side of Wichita (hereafter referred to as SW).  Duggins and Lewis had no ownership interest or involvement in the west bar. Kim ran the SW bar after it opened.

In 2009, Duggins sued Dean in state district court to gain access to the books and records of the LLC. In that case, the state court appointed William F. Cummings the receiver for the company. The state court receivership case remained pending at the time of trial of these nondischargeability claims.

Before meeting Dean and getting into the club business, Duggins had operated a cement flatwork business for more than 20 years. He closed that business in order to devote his attention to SBG. He had no prior experience in the  restaurant or bar business.  He met Dean through a mutual friend sometime in late 2007 or early 2008.   According to Duggins, the three owners' "understanding" was that each LLC member would be "working partners," even though, as noted above, the terms and conditions of the contract for deed on the property between Bratt Inv and Shanannigans, LLC granted Dean "operational control" of Shanannigans.[10]

Duggins ran the kitchen and cooked during the day shift. Dean typically worked during the lunch hour.  Kim also worked and supervised the day shift with Duggins, handling the daily bookkeeping for SBG, payment of vendors, and preparing the payroll.  Cliff worked and ran SBG during the night shift.  The bookkeeping consisted of "day sheets" that tallied cash in and out of the cash registers.  These sheets were closed out after each shift. Cash was deposited at Meritrust

---

[10] The Terms and Conditions, signed by Duggins but not Lewis, were dated June 10, 2008. Ex. A, p. 2.

nightly. In June of 2008, Kim or Dean hired Virginia Boyd Accounting to prepare compilations of the company's accounts; Kim was the principal contact with Boyd Accounting. Periodically, someone from Virginia Boyd Accounting would pick up the day sheets and prepare a running record of the business's income and expenses. Duggins had no contact with Boyd Accounting until the summer of 2009 when he inquired about the status of his 2008 K-1 statement he needed to prepare his individual 2008 tax return.[11]

Duggins was SBG's treasurer, but he performed no duties typically associated with that office other than occasionally writing or signing checks to vendors when deliveries were made to the bar. All three members of the LLC plus Kim had check signing authority, but Kim wrote the vast majority of the checks. For the first several months of SBG's operations, deposits and checks were commingled with Bratt Inv business activities and run through the Bratt Inv checking account. Kim says she was opposed to this practice but that Dean had directed it. Duggins had access to the financial records of SBG, but says that because he was new to the restaurant and bar business, he was unfamiliar with the day sheets or other financial records that Kim maintained. He was never trained to perform the daily bookkeeping function but he would periodically inquire of Kim how SBG was doing and whether they "were making any money." He had access to the check register and could ascertain the checks being written.

The evidence of what Duggins was told to induce his investment or who told it to him is scant at best. He testified that Dean introduced him to Kim and that she was present when Dean told him that SBG was subject to no debt other than the Meritrust first mortgage. Dean told him that in

---

[11] Schedule K-1 is issued by a partnership or LLC to report a partner or member's share of income, deductions, credits, etc.

exchange for his investment of $25,000, Duggins would become a one-third "partner" in the business. He later learned that the ad valorem taxes on the property were in arrears, but even after learning that, he remitted his investment in June of 2008.[12]  Though he testified that he "worked more with Kim than with Dean," Duggins could not clearly identify any representations that Kim made to him at any time before Shanannigans, L.L.C. was formed, before the January 11, 2008 annual meeting, the bar's opening, or before he paid in his investment.

Clifford Lewis's testimony supports a finding that Kim made no representations to Duggins or Lewis to induce their investment. Lewis had worked for Dean at Bratt Inv's bar, Magoo's, and had always wanted to own his own business. After Dean obtained the Shanannigans property in October of 2007, he invited Lewis to become an owner. Lewis contributed construction and remodeling labor to prepare the bar to open. All of Lewis's discussions concerning investment were with Dean, none were with Kim. Lewis did not meet Duggins until after SE opened. Lewis paid his investment in January of 2008. Because Dean credited him with "sweat equity" for the work he'd performed in the preceding fall, his cash contribution was limited to $10,000. As with Duggins, Kim made no direct representations to Lewis concerning his investment.

Cash control was loose, to say the least. One former employee testified that she was permitted to take cash advances from the register and often did so. Employees frequently paid vendors with checks that Kim signed in blank and left in the register. Kim paid several of her personal credit card bills with SBG checks, but claimed that the purchases on the bills were for items used at SE. There were several instances where it appeared SBG checks were used to pay expenses

_____

[12] Duggins actually paid the $25,000 by a check dated June 10, 2008 payable to Bratt Inv and negotiated by Dean on June 11, 2008.

-8-

incurred at rental properties owned by Bratt Inv. And, after Bratt Inv acquired and opened Shanannigan's West, Duggins and Lewis suspected that SBG funds had been diverted to support the cost of opening the other bar. Duggins's review of the SBG check register in the spring of 2009 led him to suspect that there were several questionable transactions, including what appeared to be expending SBG funds for goods and services used by SW. There also appears to have been some trading back and forth between the bars, particularly of labor and inventory.

In 2009, after Duggins had examined the SBG check register, Duggins became concerned about the business's direction and asked to see the company's books. When he was unable to see the books, he filed the state court receivership litigation on which part of this complaint is based and obtained control of the accounting records from Virginia Boyd Accounting. Duggins left SBG in February of 2010. A month later, the bar closed. During his 26 months of work at SBG, Duggins never drew a wage or salary and received no draw or distribution from the LLC.

Much of the plaintiffs' case focused on numerous account transactions large and small in an effort to prove Kim's alleged defalcation of SBG funds and property. There is little question that Kim wrote checks on the SBG account for items and expenses not associated with or attributable to Shanannigans business. But, Kim did not occupy the express or technical trust relationship with the LLC that would support excepting her debt to the receiver from her discharge under § 523(a)(4). Given that she was not a fiduciary within the meaning of that section, no detailed findings of fact concerning the extent of the alleged defalcation debt need be made here.[13]

### *Analysis*

---

[13] This finding is not a finding that defalcation of some sort did or did not occur. The receiver only alleged that Kim committed fraud or defalcation while in a fiduciary capacity. He did not plead a cause of action for larceny or embezzlement.

1.    ***Debtor Kim Bratt did not actually defraud Todd Duggins nor fraudulently induce his investment in Shanannigans, L.L.C. under § 523(a)(2)***

Section 523(a)(2)(A) provides that if a debtor contracts a debt by making a false statement upon which her creditor justifiably relies, that debt may be excepted from the debtor's discharge. Likewise, a debt incurred by actual fraud or false pretense is excepted from debtor's discharge.[14] Duggins claims that Kim made false statements of material fact to induce him to invest $25,000 in the Shanannigans enterprise and to become a one-third owner and member in the LLC. What he stated he would prove in the pretrial order differed significantly from the evidence produced at trial. In the pretrial order, Duggins asserts:

> Defendant represented to Duggins that if he made the $25,000.00 investment, Duggins (i) would be the company Treasurer and have control of, and responsibility for, the company's books and records, (ii) that Shanannigans did not have any debt except payment on its purchase contract for the real estate (actually payment on Bratt Investments, LLC's underlying mortgage to Meritrust Bank) where Shanannigans and tenant Guardian Interlock were located, (iii) that Duggins would be provided a business prospectus/plan and (iv) that Duggins would be provided a complete accounting for the company's business activities from January through June 2008. None of the above occurred.[15]

At trial, Duggins offered no evidence concerning representations (iii) and (iv). With regard to the alleged representation that the company had no debt, Duggins testified that he was told that Shanannigans only owed the mortgage against the real estate that it assumed when it acquired the bar from Bratt Inv under the contract for deed. Duggins identified two additional debts that were not disclosed to him, an unpaid bill owed to a flooring contractor who worked on the remodel of the

---

[14]  *Diamond v. Vickery (In re Vickery),* ___ B.R. ___, 2013 WL 979099; BAP No. 12-051 (10th Cir. BAP Mar. 13, 2013) (liability under § 523(a)(2) is not limited to a misrepresentation but includes the broader conduct of actual fraud or false pretense as an independent basis for liability).

[15]  Adv. Dkt. 105, pp. 5-6.

Case 10-05243    Doc# 143    Filed 03/28/13    Page 10 of 24

premises in 2007 prior to SBG's opening and unpaid real estate taxes for 2007 of approximately $5,000. This is all the evidence of misrepresentations of company debt he offered. He could not definitively link the misrepresentations to Kim. Duggins met Dean through a mutual friend. Sometime later, Dean introduced Duggins to Kim. Duggins did not identify which statements were attributed to Dean or whether any of them were attributable to Kim. He implied that Kim was present when the representations were made, but he could not articulate when and where the representations were made other than they occurred prior to the opening of the bar and grill in January. He did not carry his burden of proving that Kim fraudulently induced him to invest.

With respect to the alleged representations in (i) that Duggins would be the treasurer and have financial control, Duggins indeed was elected treasurer of the LLC at the January 11, 2008 annual meeting. At all times, he had check signing authority. As noted before, Kim was elected secretary. Duggins testified that Kim retained charge of the books because he had no prior experience running a bar or restaurant and was unfamiliar with the types of records and forms utilized by SBG. The parties apparently contemplated that Kim would "train" Duggins on the company's books and records, but that never occurred. Either Duggins and Kim were unable to cooperate on the financial aspects of the operations and the transition of the bookkeeping function to Duggins or Duggins did not have the time to perform financial duties while running SBG's day shift. Duggins candidly admitted that he had on-site access to the check register and other financial records but that he did not comprehend most of the books and records due to his inexperience in the restaurant/bar business.

Serving the fresh start objective of bankruptcy, exceptions to discharge should be narrowly

construed and any doubts resolved in Kim's favor.[16] To prevail on his actual fraud claim under §
523(a)(2), Duggins had to prove by a preponderance of the evidence that Kim made a
misrepresentation of a material fact with the intent to deceive Duggins, that Duggins relied upon the
misrepresentation, that his reliance was justifiable, and that Kim's representation caused him to
sustain a loss.[17] As applied to the evidence here, the existence of the first element – a
misrepresentation by Kim – is, at best, vague and inconclusive. Duggins provided little detail of the
circumstances surrounding the alleged representations – the "who, what, where, and when" of the
representations.  And when placed in the context that Duggins would be going into business with
Kim's husband, that Duggins was introduced to Dean through a third party, and that he was
introduced (at some unspecified point) to Kim by her husband, Duggins failed to present a
compelling or even a credible case of fraud on the part of Kim. It is not sufficient to impute fraud
upon Kim by her holding the office of secretary  or the fact that she was the spouse of Dean.  And
nothing in the evidentiary record shows that Dean  was acting as Kim's agent.[18] In short, Kim, not
her husband, must have made the actual misrepresentations to Duggins or somehow participated in
the fraud.  The Court is simply not persuaded by the evidence that Kim, having met Duggins second-

---

[16] *In re Kaspar,* 125 F.3d 1358, 1361 (10th Cir. 1997).

[17] *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir. 1996); *Grogan v. Garner,* 498 U.S. 279, 287 (1991) (Section 523(a) discharge exceptions are subject to the preponderance of the evidence standard of proof.).

[18] *See Columbia State Bank, N.A. v. Daviscourt (In re Daviscourt)*, 353 B.R. 674, 686-87 (10th Cir. BAP 2006) (Court would not impute debtor-husband's fraud upon defendant-debtor-spouse to except guarantee of company line of credit from discharge, even where the defendant spouse was a 50% owner and officer of the company, without some additional evidence that the debtor-spouse intended her husband to act as her agent.); *First New Mexico Bank v. Bruton (In re Bruton),* 2010 WL 2737201 at *5-*6 (Bankr. D. N.M. July 12, 2010) (LLC husband-member's fraud would not be imputed to LLC wife-member).

-12-

hand and not a proposed partner with him, made any misrepresentations to Duggins with the requisite intent to deceive Duggins into investing in the venture.[19]

Even if Kim were found to have made the representations, there is no evidence of Duggins' reliance. In *Field v. Mans*, the Supreme Court addressed the reliance element in a § 523(a)(2) case, adopting the less stringent, subjective "justifiable reliance" standard.[20] Under that standard, Duggins had no duty to investigate the accuracy of the representations unless they were patently false and their falsity was apparent to him at the time they were made. For example, if Duggins had been shown or provided financial records prior to his investment that reflected debt other than the mortgage, his reliance would not be justified. Before determining whether his reliance was justifiable, the Court must consider whether he relied at all.[21] Again, the evidence is non-existent. The Court heard no evidence that if Duggins had known these other debts existed or knew that he would not have responsibility for SBG's books and financial records, he would not have made the investment. Discontinuing his flat work business suggests some level of reliance, but Duggins never stated that had he known of the additional debts or that he would not be given responsibility for the financial records of the company, he would not have acted as he did. In fact, six months passed between the time he became treasurer of the LLC and when he actually made his $25,000 investment. He had access to the financial records during all that time. Moreover, Duggins was

---

[19] The totality of the circumstances do not suggest that if the representations were made, they were intended to deceive Duggins or that Kim knew the statements were false when made.

[20] 516 U.S. 59, 66 (1995) ("The question here is what, if any, level of justification a creditor needs to show *above mere reliance in fact* in order to exempt the debt from discharge under § 523(a)(2)(A).").

[21] *Id.* at 70 (borrowing from common law fraud principles in interpreting the reliance element of § 523(a)(2)(A), the Supreme Court noted that "both actual and 'justifiable' reliance are required.")

-13-

present and helping to operate Shanannigans on a daily basis, working side by side with Kim.[22]

Duggins failed to satisfy his burden of proof on the § 523(a)(2)(A) fraud discharge exception.

> **2.** ***Did Debtor Kim Bratt commit a defalcation while acting in a fiduciary capacity,
> rendering her debt nondischargeable under § 523(a)(4)?***

The Receiver claims that Kim converted SBG's funds and personal property and diverted

some of it to Bratt Inv for use on their rental properties, to Shanannigans West, or to her personal

use. If proven, these conversion contentions might support an exception to her discharge under §

523(a)(6), but the Receiver did not plead that theory nor was it made part of the final pretrial order.

Instead, the Receiver relied entirely on § 523(a)(4), alleging only that Kim committed defalcation

while acting in a fiduciary capacity.[23]

Section 523(a)(4) specifically excepts from discharge, debts that are incurred "for fraud or

defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[24] A defalcation under

this discharge exception is a debtor-fiduciary's failing to account for funds or property that were

entrusted to him or her in violation of a defined fiduciary duty.[25] Proving this exception requires

demonstrating that a fiduciary relationship existed between the debtor and the objecting party and

---

[22] Moreover, if the alleged misrepresented facts were so important to Duggins, the Court questions why he proceeded to work compensation-free for over two years. If he truly relied on the representations, one would expect much swifter reaction to the manner in which SBG was being operated and his apparent lack of financial control.

[23] Adv. Dkt. 105, pp. 11, § 7.1.D and 12, § 8. *See Patrons State Bank & Trust Co. v. Shapiro,* 215 Kan. 856, 528 P.2d 1198 (1974) (corporate officer is personally liable for acts that constitute conversion of property belonging to another, even though the acts were committed while acting as an officer of the corporation).

[24] 11 U.S.C. § 523(a)(4).

[25] *Antlers Roof-Truss & Builders Supply, et al. v. Storie (In re Storie)*, 216 B.R. 283, 288 (10th Cir. BAP 1997).

-14-

that the debtor committed the defalcation in the course of that fiduciary relationship.[26] Once the creditor makes this showing, the burden shifts to the fiduciary to account for the entrusted property.[27]

### a. *Controlling Tenth Circuit law requires showing the existence of an express or technical trust to support a § 523(a)(4) fiduciary defalcation claim.*

While Kim may have had general fiduciary duties to the LLC under state law, whether she was a fiduciary for § 523(a)(4) purposes is a matter of federal law. Applying controlling Tenth Circuit authority makes clear that the Receiver's § 523(a)(4) claim falls short. In *Fowler Bros. v. Young,* the Tenth Circuit noted that the fiduciary relationship required by § 523(a)(4) is different from a general fiduciary relationship recognized by state law.[28] The *Fowler Bros.* court described the distinction:

> Under this circuit's federal bankruptcy case law, to find that a fiduciary relationship existed under § 523(a)(4), the court must find that the money or property on which the debt at issue was based was entrusted to the debtor. [citations omitted]. Thus, an express or technical trust must be present for a fiduciary relationship to exist under § 523(a)(4). [citations omitted]. Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, . . . , nor an inequality between the parties' knowledge or bargaining power, . . ., is sufficient to establish a fiduciary relationship for purposes of dischargeability. 'Further, the fiduciary relationship must be shown to exist prior to the creation of the debt in controversy.' [29]

Thus, as a matter of bankruptcy law, § 523(a)(4) contemplates a trust relationship that is narrower than the general duty of one in a fiduciary relationship. It may be an express trust, defined in a written or oral agreement that created the relationship and identified the property held in trust (the

---

[26] *Watson v. Parker (In re Parker),* 264 B.R. 685, 700 (10th Cir. 2001).

[27] *Storie,* 216 B.R. at 288.

[28] *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1371 (10th Cir. 1996) (question of fiduciary status is one of federal law but state law is relevant to the inquiry.).

[29] *Id.* at 1371-72 (interior citations omitted).

-15-

*res*), the trustee, and the trustee's duties with respect to the *res*. Or, it may be a technical trust that is imposed by statute.[30] The statute must define the *res*, spell out the fiduciary duties of the party to whom the trust property is entrusted, and the trust must have arisen on the *res* before the debtor took the action that created the debt.[31] The trust relationship must be imposed by the law rather than implied from it.[32] Unless the trust is an express or technical one, other relationships from which general fiduciary duties might be implied by state law principles will not support a defalcation claim under § 523(a)(4). For example, a general attorney-client relationship has been found insufficient to establish the fiduciary relationship required under § 523(a)(4).[33] Neither is a partnership relationship unless there is an express agreement or a state law creating a trust relationship.[34]

> ### b. There was no express trust relationship between Kim Bratt and Shanannigans LLC.

The Receiver offered no documentary or other evidence to show that an express trust had

---

[30] *In re Parker,* 264 B.R. at 700, citing *Allen v. Romero (In re Romero),* 535 F.2d 618, 621 (10th Cir. 1976) (discussing the requisite fiduciary capacity under the Bankruptcy Act's predecessor to § 523(a)(4)).

[31] *In re Kelley,* 215 B.R. 468 (10th Cir. BAP 1997); *In re Merrill,* 252 B.R. 497 (10th Cir. BAP 2000). *See e.g., In re Tatro,* 387 B.R. 833, 840 (Bankr. D. Kan. 2008) (State natural guardian statute, KAN. STAT. ANN. § 59-3053(a), imposed trust relationship that satisfied § 523(a)(4)).

[32] *Allen v. Romero (In re Romero),* 535 F.2d 618, 621-622 (10th Cir. 1976).

[33] *Fowler Bros., supra; Parker,* 264 B.R. at 700.

[34] *Smolen v. Hatley (In re Hatley),* 227 B.R. 757, 760 (10th Cir. BAP 1998) (partners did not have an express, written agreement establishing fiduciary relationship and neither Oklahoma common law or Uniform Partnership Act created a trust relationship sufficient to satisfy § 523(a)(4)); *Holaday v. Seay (In re Seay),* 215 B.R. 780, 786-87 (10th Cir. BAP 1997) (same); *In re Zanetti-Gierke,* 212 B.R. 375, (Bankr. D. Kan. 1997) (Under Kansas law, the statutory provision delineating partners' accountability as fiduciaries, KAN. STAT. ANN. § 56-321(a) (1994) did not create a technical or express trust and therefore partners are not fiduciaries for purposes of § 523(a)(4)).

-16-

been created. None of the LLC's organic documents were offered as evidence at trial.[35] While an operating agreement was referenced in the first annual meeting minutes, it was not offered either. Ordinarily that document would set out the identity of the manager, terms of governance, and duties and liabilities of the members, manager, and officers of the company.[36] The operating agreement may have created an express trust, but it is absent from the record.

### c. *Kim Bratt's position as secretary of Shanannigans LLC did not impose a technical trust on her or render her a § 523(a)(4) fiduciary;*

The Kansas Revised Limited Liability Company Act governs the establishment and operation of limited liability companies in Kansas.[37] If a technical trust had been imposed upon Kim by statute, it would be found in the LLC Act. There is no default provision in the Act that entrusts the funds or property of the LLC to the members, the manager or the officers. Nor does any provision delineate the attributes of a trust, articulate trust duties, or otherwise establish a trust relationship among members and the manager. While § 17-7688 of the Act comes closest by addressing a member's or manager's liability to third parties and recognizing a member or manager's potential liability to the limited liability company, it does not expressly create a trust relationship.[38] KAN. STAT. ANN. § 17-7698 provides that, unless provided otherwise by the operating agreement, a member or manager may delegate the power to manage and control the business of the LLC to an

---

[35] *See* KAN. STAT. ANN. § 17-7673 (requiring articles of organization for formation of a limited liability company);

[36] *See* KAN. STAT. ANN. § 17-7668(b).

[37] KAN. STAT. ANN. § 17-7662 to 17-76,142 (2007 and 2011 Supp.)

[38] The Court notes that no reference is made in this statute to enforcing an "officer's" liability to the company, *see* § 17-7688(c), though as noted *infra*, members and managers may delegate rights and duties to officers. KAN. STAT. ANN. § 17-7698.

-17-

officer. No evidence suggested that any of the members "delegated" management and control of the company to Kim. And, while KAN. STAT. ANN. § 17-76,134 indirectly recognizes that a member, manager or "other person" may have fiduciary duties in law or equity to the other members or to the company, those duties may be expanded or restricted by provisions in an operating agreement.[39]

The parties stipulated in the pretrial order that Duggins, Lewis, and Dean Bratt "were one third equal partners [sic] in Shanannigans."[40] The minutes of the first annual meeting of the members of the LLC recite the members' proportionate ownership interests and note the election of officers. The minutes refer to an operating agreement, but do not identify the manager or member-manager of the LLC.[41] Without the operating agreement in evidence, whether Kim's duties as secretary included trust duties cannot be determined.[42] Without the direct imposition of fiduciary duties on Kim by the operating agreement or by statute, no technical trust arose.

The Receiver primarily relies on Kansas case law to contend that Kim's status as secretary of Shanannigans LLC satisfies the fiduciary relationship requirement of § 523(a)(4).[43] Kansas

---

[39] As noted in *In re Zanetti-Gierke, supra*, the Kansas statutory provision recognizing a partner's accountability as a fiduciary did not create a technical or express trust as required by § 523(a)(4). *See also, In re Novak,* 97 B.R. 47, 59 (Bankr. D. Kan. 1988).

[40] Adv. Dkt. 105. Technically, the "owners" of a limited liability company are its members, and are not "partners" per se.

[41] Ex. 1. A limited liability company may be managed by its members or by a manager. *In re Metcalf Assocs.-2000,* 42 Kan. App. 2d 412, 213 P.3d 751 (2009); KAN. STAT. ANN. § 17-7693 and § 17-7663(k).

[42] The Kansas general corporation code requires a corporation to have at least one officer who transcribes the minutes of the meetings. KAN. STAT. ANN. § 17-6302(a).

[43] *See Diederich v. Yarnevich,* 40 Kan. App. 2d 801, 196 P.3d 411 (2008) (Under Kansas law, directors and officers of professional corporation have a strict fiduciary duty to act in the best interests of the corporation and its stockholders, requiring officers and directors to work for the general interests of the corporation.); *Newton v. Hornblower, Inc.,* 224 Kan. 506, 582 P.2d

-18-

corporate directors and officers owe a strict fiduciary duty to the corporation and its shareholders, but that fiduciary relationship is a general duty to act in the best interests of the corporation and in good faith. Standing alone, it does not rise to the technical trust relationship described by *Fowler Bros.* Kansas courts have recognized that a member-manager of a limited liability company has a similar general fiduciary duty to the company and its other members.[44] No Kansas statutes or cases equate this general duty with the entrustment of company money or property to an officer or create a trust relationship and the accompanying fiduciary capacity necessary to support a finding of a fiduciary relationship under § 523(a)(4).[45] Without a statute defining the *res*, and the duties of the fiduciary with respect to it, the Receiver cannot demonstrate that a technical trust has been imposed. Whatever fiduciary duty Kansas law implicates for corporate directors and officers is a general one, far short of the technical trust that Tenth Circuit authority requires in support of a defalcation exception to discharge under § 523(a)(4).

> **d.** **Even if Tenth Circuit law relieves a corporation from demonstrating an express or technical trust in § 523(a)(4) cases, that exception does not apply here.**

Two judges of this court have recognized what amounts to an exception to the "express or

---

1136 (1978) (recognition of same rule in context of a general corporation).

[44] *See Emprise Bank v. Rumisek,* 42 Kan. App. 2d 498, 215 P.3d 621 (2009) (Member-manager of limited liability company owed fiduciary duty to other members of company.).

[45] *Cf. In re Kalinowski,* 482 B.R. 334 (10th Cir. BAP 2012) (Individual chapter 7 debtor who controlled and acted as de facto manager of construction company organized as a limited liability company and was subject to the New Mexico Construction Industries Licensing Act that proscribed diversion of funds paid to the limited liability company to other construction projects, stood in a fiduciary capacity for purposes of § 523(a)(4).). *See also, Speer v. Dighton Grain, Inc.,* 229 Kan. 272, 624 P.2d 952 (1981) (corporate officer is not personally liable for conversion committed by corporation or one of its officers merely by virtue of holding office; corporate officer must participate in or breach duty owed to owner of property to be held liable).

technical trust" requirement that neither *Fowler Bros.* nor any subsequent Tenth Circuit case have discussed. In the Kansas bankruptcy court cases, the judges held that where the plaintiff asserting the § 523(a)(4) claim is the corporation itself, the plaintiff need not show the existence of an express or technical trust because an officer's general fiduciary obligation is sufficient to sustain the objection under § 523(a)(4). In *In re Karr*, Judge Somers concluded that the relationship of a corporate officer to a corporation "commonly imposes a fiduciary relationship."[46] He noted that past courts have concluded that "it has been long settled" that officers are fiduciaries of their corporations, both under § 523(a)(4) and its predecessor, § 17(a)(4) of the Bankruptcy Act of 1898.[47] Accordingly, when a corporation itself, rather than a creditor or shareholder, objects to the discharge of a corporate officer's debt to it, no express or technical trust is required.[48] *In re Cowley* supports this proposition, holding that "with respect to the first element [express or technical trust], it has long been settled that a corporate officer is a "fiduciary" of the corporation, within the meaning of § 523(a)(4) and § 17(a)(4), its predecessor section under the Bankruptcy Act of 1898."[49] *Cowley* also concludes that Kansas law "defines corporate officers as fiduciaries of the corporation" and calls upon *Pepper v. Litton* as support for its general proposition that officers' and directors' fiduciary

---

[46] 442 B.R. 785, 801 (Bankr. D. Kan. 2011), citing Leah A. Kahl and Peter C. Ismay, *Exceptions to Discharge for Fiduciary Fraud, Larceny, and Embezzlement,* 7 J. Bankr. L. & Prac. 119, 122 (1998).

[47] *Id.* at 801-02.

[48] *Id.* at 802-03.

[49] *In re Cowley*, 35 B.R. 526, 528-29 (Bankr. D. Kan. 1983). *Cowley* predates the *Fowler Bros.* decision and no other Tenth Circuit authority since *Fowler* even references, far less approves, this "corporate plaintiff" exception.

obligations may be enforced by corporations and their bankruptcy trustees.[50] Judge Berger has

reached a similar conclusion in *In re Markley*.[51]

But other courts in the Tenth Circuit have rejected the corporate plaintiff exception as being

contrary to *Fowler Bros.* In *In re Green*,[52] the debtor was the former vice president, secretary and

director of a corporation and ran it day-to-day. The corporation sought to except from debtor's

discharge a debt allegedly incurred by the debtor's self-dealing, breach of fiduciary duty, and

conversion of corporate property. The New Mexico bankruptcy court applied the *Fowler Bros.*

narrow view of fiduciaries covered by § 523(a)(4), requiring the existence of an express or technical

trust.[53] It concluded that there was no trust. It found that no provision in New Mexico's Business

Corporation Act makes directors or officers of a corporation a trustee of corporate assets;

corporations themselves have the power to own and hold real and personal property. Even though

New Mexico's Act "arguably recognize[s] a generalized fiduciary duty of officers and directors to

the corporation," it did not specify any specific fiduciary duties that they must exercise over any

specific assets.[54] The bankruptcy court also rejected debtor's argument that the existence of a

---

[50] *Id.*, citing *Delano v. Kitch*, 542 F.2d 550 (10th Cir.1976); *Parsons Mobile Products, Inc. v. Remmert*, 216 Kan. 256, 531 P.2d 428 (1975); *Newton v. Hornblower*, 224 Kan. 506, 582 P.2d 1136 (1978). *See also Pepper v. Litton*, 308 U.S. 295, 306, 60 S. Ct. 238, 245, 84 L. Ed. 281 (1939) (Bankruptcy trustee of corporation may seek to subordinate claim of director or officer who has violated fiduciary duties to corporation; this case was not a § 523(a)(4) discharge exception case).

[51] 460 B.R. 793 (Bankr. D. Kan. 2011). *See also In re Jenkins,* 462 B.R. 822 (Bankr. D. Kan. 2011) (Berger, J.).

[52] 386 B.R. 865 (Bankr. D. N.M. 2008).

[53] *Id.* at 869.

[54] *Id.* at 870. New Mexico's statute governing the duties of directors, provided: "A director shall perform his duties as a director . . . in good faith, in a manner the director believes

-21-

general fiduciary duty, standing alone, suffices for § 523(a)(4) liability.

> This Court is bound by Tenth Circuit case law such as *In re Romero* and *In re Young* [*Fowler Bros.*], both of which require the existence of an express or technical trust before finding a fiduciary duty that is subject to Bankruptcy Code section 523(a)(4). There is no express trust in this case, and there is no technical or statutory trust arising from New Mexico's Business Corporation Act.[55]

*Karr* and *Markley* present fact patterns that differ significantly from ours. In both cases, the debtors were either sole or dominant shareholders, directors, and officers of their corporations. In both cases, the debtors essentially controlled all corporate activity, including accounts. In *Karr*, the debtor made misrepresentations to the other board members. In *Markley*, the debtor lived out of the corporate accounts. Here, Kim was one of several officers, but was not a member or manager of the company, and did not participate in the massive pattern of misconduct like that found in *Karr* and *Markley*. Whatever financial responsibility she had for the company did not come by virtue of her office. By contrast, Dean *was* a member of the LLC and wielded "operational control," suggesting that he was the de facto member-manager of the company.[56]

Without a statutory provision that defines the trust *res,* imposes a trust relationship on the trust property, designates a member, manager or "other person" as trustee, or describes the "trustee's" duties with respect to the trust property, I cannot conclude that the law imposed a fiduciary duty on Kim with respect to the funds and property of the LLC that would sustain a § 523(a)(4) action.

---

to be in or not opposed to the best interests of the corporation and with such care as an ordinarily prudent person would use under similar circumstances in a like position." *Id.* at 871, n. 2.

[55] *Id.* at 871. *See also, In re Steele,* 292 B.R. 422 (Generic fiduciary duties of trust, loyalty, good faith and fair dealing that director of closely-held corporation owed to minority shareholder did not rise to level of fiduciary relationship of kind required by § 523(a)(4)).

[56] Ex. A, p. 2.

-22-

> **e.** *The Receiver only pled a fiduciary defalcation claim under § 523(a)(4); he did not assert a claim for embezzlement or larceny.*

Finally, § 523(a)(4) sanctions not only a fiduciary's fraud or defalcation, but also debtor's commission of embezzlement or larceny. These two alternative prongs of § 523(a)(4) do not require proof of a fiduciary relationship, but they do require proof of a certain mental state.[57] The Receiver did not allege either embezzlement or larceny in the final pretrial order; he only asserted a claim based upon fiduciary fraud or defalcation.[58] Indeed no reference at all was made to embezzlement or larceny. Nor does the record suggest that an embezzlement or larceny claim was tried by the implied consent of the parties. The Tenth Circuit Bankruptcy Appellate Panel recently reaffirmed that such consent is only implied when "a party introduces evidence on the new issue or fails to object when the opposing party introduces such evidence."[59] Nor did the Receiver move to amend the pleadings to conform to the evidence at trial which is the way to raise a claim that was not initially pled.[60] Moreover, there is no evidence of the elements of embezzlement and larceny, including Kim's intentional misconduct, in the record. Allowing such an amendment would be

---

[57] *In re Zanetti-Gierke,* 212 B.R. at 380 (embezzlement or larceny is actionable regardless of debtor's fiduciary status). In the case of larceny, the creditor must prove debtor wrongfully took property of another without the other's consent and with the intent to convert the property to debtor's own use. Embezzlement differs from larceny in that the debtor's original taking was lawful and then fraudulently appropriated. Both require a showing that debtor intended to convert the property to his or her own use. *Id.* at 381.

[58] In addition, plaintiff's trial brief clearly articulates that Kim's debt should be excepted from discharge under the fiduciary fraud or defalcation prong of § 523(a)(4). No mention of embezzlement or larceny is made in the trial brief. *See* Adv. Dkt. 124.

[59] *Diamond v. Vickery (In re Vickery),* ___ B.R. ___, 2013 WL 979099 at *10; BAP No. 12-051 (10th Cir. BAP Mar. 13, 2013).

[60] *See* Fed. R. Civ. P. 15(b)(2); *Vickery* at *10, citing *Green Country Food Mkt., Inc. v. Bottling Group,LLC,* 371 F.3d 1275, 1281 (10th Cir. 2004) (Conforming the pleadings to the evidence is within the trial court's discretion.).

-23-

unjust and constitute unfair surprise – particularly to an unrepresented debtor. Pursuit of a § 523(a)(4) embezzlement or larceny claim would have required the Receiver to prove that Kim intended to appropriate SBG's funds and property to her own use. Kim was never placed on notice that she was being accused of that.[61]

### *Conclusion*

Todd Duggins failed to prove that Kim Bratt made false representations that induced him to invest in Shanannigans, L.L.C. Likewise, the Receiver failed to show that Kim Bratt had the requisite fiduciary capacity to support a claim of defalcation under § 523(a)(4). While state law civil wrongs may have been committed by Kim Bratt or by others not party to this action, there is no basis for excepting the debts claimed by Duggins and the Receiver from Kim Bratt's discharge. Judgment should therefore be entered for Kim Bratt on the complaint and costs taxed to the plaintiffs. A judgment on decision will issue this day.

# # #

---

[61] In contrast, a defalcation requires no mental culpability on the part of debtor and includes conduct that does not rise to the level of embezzlement or larceny. *Storie,* 216 B.R. at 287-89 (debtor-fiduciary need not subjectively intend to breach her fiduciary duty); *Merrill,* 252 B.R. at 506.